IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ELLA GRACE GILL, | ) | Case No. 5:25-cv-00242 |
| | ) | |
| Plaintiff, | ) | JUDGE J. PHILIP CALABRESE |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff, Ella Grace Gill ("Gill"), seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for supplemental security income ("SSI") under title XVI  of the Social Security Act. This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ") failed to apply proper legal standards in the Listings determination, I recommend that the Commissioner's final decision denying Gill's application for SSI be vacated and that her case be remanded for further consideration.

## II.      Procedural History

Gill filed for SSI on September 1, 2022, alleging disability as of August 15, 2021 and with a protected filing date of July 9, 2022. (Tr. 151-57; *see also* Tr. 19). The claims were denied initially and on reconsideration. (Tr. 85-89; 96-99). She then requested a hearing before an Administrative Law Judge. (Tr. 100). Gill (represented by counsel) and a vocational expert

("VE") testified before the ALJ on December 6, 2023. (Tr. 35-63). On February 7, 2024, the ALJ issued a written decision finding Gill not disabled. (Tr. 17-26). The Appeals Council denied her request for review on December 17, 2024, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; see 20 C.F.R. §§ 416.1455, 416.1481). Gill timely filed this action on February 7, 2025. (ECF Doc. 1).

### III.    Evidence

#### A.    Personal, Educational, and Vocational Evidence

Gill  was 18 years old on the alleged onset date, making her a younger individual according to Agency regulations. (*See* Tr. 25). She graduated from high school. (*See id*). In the past, she worked part time cleaning out houses after estate sales but otherwise has no substantial gainful activity or past relevant work. (*Id.*).

#### B.    Relevant Medical Evidence

Prior to the alleged onset date, an Individualized Education Plan (IEP) from September 4, 2020 indicated Gill could participate in the general education curriculum, although she displayed weakness in short term memory and required support for her math skills. (Tr. 242-51). In her math skills, Gill could complete single-step word problems and determine the correct amount of change but was inconsistent in her ability to determine elapsed time and had difficulty in completing all types of multi-step math problems. (Tr. 247). The IEP noted diagnoses of arthralgia, vitamin D deficiency, myalgia, and ligament laxity, with reports of an autoimmune disorder. (*Id.*).

An assessment completed by Alicia Veauthier, EdS, NCSP, on September 21, 2020 indicated that Gill had relative weakness in her short-term memory skills, which could interfere with her ability to remember directions and recall information long enough to complete a task.

(Tr. 312). Dr. Veauthier recommended accommodations to support Gill's short-term memory skills, such as receiving directions in writing, restating information to ensure understanding, and frequent review and practice of newly learned information. (*Id.*).

On August 23, 2021, Gill presented to the emergency department for acute respiratory distress despite home DuoNeb; she presented hypoxic to 70%, tachypneic to the 40s, and tachycardic to the 150s. (Tr. 446). She was provided 15 liters of oxygen and saturation improved to 95%. (*Id.*). Notes mentioned Gill was followed by pulmonology, rheumatology, and ophthalmology. (Tr. 446-47). She was noted as +C-ANCA, raising concern for vasculitis, and had recurrent granulomas. (*Id.*). She had also been on antibiotics for an infected left axillary cyst that had required surgical removal. (*Id.*). She had previously reported to the emergency department on August 4, 2021 with a similar presentation of respiratory distress. (*Id.*). Gill was admitted to the hospital on August 23 and discharged on August 29, 2021. (*See* Tr. 505). Gill continued to have difficulty breathing, wheezing, and shortness of breath after discharge, despite DuoNeb treatment every 6 hours, Dulera twice daily, steroid taper, and antibiotic. (*Id.*). She followed up with Christine Bohovic, APRN-CNP for bronchoscopy due to chronic pansinusitis, right nasal polyps, and moderate persistent asthma. (*Id.*).

Follow-up notes from September 7, 2021 indicated Gill had recurrent cysts, that had been debrided but remained open without healing despite multiple treatment plans. (Tr. 500). Gill also had infection and difficulty healing for a left ear piercing and was treating with plastic surgery. (*Id.*). Gill was taking Humira at the time, which may have contributed to poor wound healing; she was also on steroids for an unknown lung issue. (*Id.*).

The bronchoscopy, performed on September 10, 2021, revealed blood in the right upper lobe and left lower lobe of her lungs. (Tr. 528). Gill followed up after the bronchoscopy with

Douglas Moses, M.D. (Tr. 532). Dr. Moses indicated presumed vasculitis, which was thought to be granulomatosis with polyangiitis due to +PR3-ANCA; pulmonology and rheumatology coordinated post-surgical care. (Tr. 532).

On May 25, 2022, Gill met with Amy Ranieri, exercise physiologist. (Tr. 793). She reported polyps in her nose, making it hard for her to breathe, as well as pain in her chest and throat, although she also reported breathing better. (*Id.*). Gill had an appointment to have a scope of her nasal cavity and throat for June 2022. (*Id.*). She reported being able to lift and carry items and walking a few miles while at the flea markets. (*Id.*). Ms. Ranieri recommended Gill walk as much as tolerated. (*Id.*). The bronchoscopy was performed on June 13, 2022, and revealed excessive tissue growth in her nares. (Tr. 1003-05).

Gill met with Chelsea Weyand, Psy.D., on July 6, 2022 for her generalized anxiety disorder. (Tr. 815-17). Gill reported less anxiety and depression and continued to work with her father selling vinyl albums at flea markets. (Tr. 816). Dr. Weyand recommended follow up for at least six to eight sessions to meet treatment plan goals. (Tr. 817).

Subsequent to her alleged onset date, on July 11, 2022, Gill met with Ian Boydstun, D.O., complaining of blurred vision and headaches. (Tr. 818). Past diagnoses included ADHD, anxiety, exercise-induced shortness of breath, granulomatosis with polyangiitis with vasculitis,[1] joint pain, moderate persistent asthma, and scleritis. (*Id.*). Gill had not yet filled her prescription for her glasses. (*Id.*). Gill had a stable exam with no evidence of retinal vasculitis or other

---

[1] Granulomatosis with polyangiitis, or Wegener's granulomatosis, is a rare autoimmune disease that causes chronic inflammation in the small blood vessels and involves small masses forming in blood vessels and other organs. Cleveland Clinic, *Granulomatosis with Polyangiitis (formerly Wegener's Granulomatosis)* https://my.clevelandclinic.org/health/diseases/granulomatosis-with-polyangiitis-formerly-wegeners-granulomatosis (last accessed Aug. 21, 2025). It causes muscle and joint pain, malaise, fatigue, loss of appetite, weight loss, nasal swelling, narrowing in the throat, bleeding in the lungs, edema, eye pain and pressure, skin lesions, and polyneuropathy. *Id.*

ophthalmic/orbital inflammation. (Tr. 824). Dr. Boydstun prescribed glasses and recommended follow up in six months. (*Id.*).

Also on July 11, 2022, Gill met with Mamatha Kambalapalli, M.D. (Tr. 825). Dr. Kamabalapalli noted diagnoses of scleritis, positive ANA, and Wegener's granulomatosis, after evaluation for hypothyroidism and positive testing by rheumatology in December 2019. (*Id.*). Gill was started on Rituximab infusions every six months in October 2021, with the last infusion in April of 2022. (*Id.*). Dr. Kambalapalli recommended taking Vitamin D 2000 mg daily. (*Id.*). Gill previously had a mildly elevated TSH of 7.8 in September 2019, but recent labs from August of 2021 and April of 2022 were normal without medication; Dr. Kambalapalli continued to hold off levothyroxine in favor of periodic monitoring of thyroid labs. (Tr. 834). Dr. Kambalapalli recommended follow up in nine months. (Tr. 835).

On July 13, 2022, Gill met with Marnie Walston, M.D., for follow up after abnormal weight gain. (Tr. 836). Dr. Walston noted that Gill had lost 2.1 kg since the last visit, attributed to a new supplement she had been taking. (*Id.*). Gill was following with endocrinology, pulmonology, and ENT, and was planning to see GI for throat irritation. (*Id.*). Dr. Walston indicated Gill would likely need surgery to reestablish her nasal airway. (*Id.*). Gill reported actively working at the flea market, including buying and selling, with lots of walking and lifting. (*Id.*). Examination was positive for shortness of breath, with no wheezing; heartburn, but improved; joint pain, tingling in her hands, and anxiety. (Tr. 838). Dr. Walston indicated Gill's issues with granulomatosis were stabilizing overall. (Tr. 839). Gill declined bariatric surgery. (*Id.*). Dr. Walston noted Vitamin D deficiency, consistent with obesity, and recommended weight loss and provided a prescription for Vitamin D3. (Tr. 840).

Also on July 13, 2022, Gill met with Geoffrey Putt, Psy.D. for pediatric weight management. (Tr. 842-45). Gill reported 0/10 pain. (Tr. 843). Dr. Putt indicated Gill was on a bariatric track but she was not close to surgery due to a large number of comorbidities and other medical complications. (Tr. 844). Gill reported doing a lot of walking at the flea markets, working approximately five days per week while also completing online classes. (*Id.*). Dr. Putt recommended mindful eating and not eating while looking at screens. (*Id.*).

On July 20, 2022, Gill met with Dr. Weyand and reported making some progress on her treatment plan, although she had low motivation and would only shower once a week and would go several days without brushing her teeth. (Tr. 855).

At her August 1, 2022 appointment with Dr. Weyand, Gill reported she had been brushing her teeth more regularly but was unchanged in her showering schedule. (Tr. 857). On August 22, 2022, Gill reported to Dr. Weyand that she had not sustained her improvement in hygiene and was only brushing her teeth, showering, and changing her clothes once per week. (Tr. 859).

Gill met with Michael Pena, M.D. on August 25, 2022 for follow up of moderate asthma. (Tr. 874). Bronchoscopy did not reveal any hemorrhaging and Gill had normal lower airways and normal larynx. (*Id.*). Gill reported cysts, tiredness, and felt that her eyes were flaring up. (*Id.*). Gill reported difficulty breathing through her nose, affecting her sleep. (Tr. 875). On examination, Gill was positive for malaise and fatigue, shortness of breath, and extensive scar tissue in bilateral nostrils. (Tr. 878). Gill had a planned visit with ENT, and Dr. Pena recommended a sleep study once her nose was repaired. (Tr. 880).

Gill met with exercise physiologist Amy Ranieri on August 25, 2022, where Gill reported working at flea markets on the weekends, from Fridays to Mondays. (Tr. 860). Ms. Ranieri set an exercise goal of 30 minutes of walking on the days Gill did not work at the flea market. (*Id.*).

On September 16, 2022, Gill had a virtual visit with Troy Woodard, M.D. in preparation for sinus surgery after recommendation of surgical scar excision and repair of nasal vestibular stenosis. (Tr. 1186-87). Dr. Woodard discussed timing for the surgery and answered Gill's questions regarding the upcoming surgery. (Tr. 1188).

Gill followed up with Ms. Ranieri on September 29, 2022. (Tr. 1037). During that visit, Gill reported walking as tolerated but has had hip pain, as was normal before her infusions with rheumatology. (Tr. 1038). Her daily movement had increased and she continued to work with her father at the flea market and at estate sale clean outs. (*Id.*). Gill also met with Amy Perusek, APRN-CNP on September 29, 2022. (*Id.*). NP Perusek noted weight loss of 1.4 kg since the last visit in August, and that Gill was no longer pre-diabetic. (Tr. 1039). Gill reported following with psychiatry for anxiety and expressed an interest in starting medication for anxiety. (*Id.*). Examination was positive for congestion, shortness of breath, joint pain, nervousness/anxiety, menstrual problems, and sleep disturbance, but she otherwise appeared healthy, alert, and active. (Tr. 1041). Gill then met with Dr. Putt and reported she had started work cleaning out homes for estate sales; she reported pain at a 0/10. (Tr. 1048). Dr. Putt recommended she switch high-calorie beverages for water to reduce hunger feelings, and to chew gum to avoid eating while bored. (Tr. 1049).

On October 28, 2022, Gill met with Marlene Thompson, APRN-CNP for infusion treatment. (Tr. 1062-63). She reported to the clinic in September that her joints and back were starting to hurt, and that Tylenol and ibuprofen were not providing much relief. (Tr. 1063). Her

back pain included shooting pain into her leg. (*Id.*). Tenderness would last for about a week then would self-resolve. (*Id.*). She had not started physical therapy. (*Id.*). Gill was positive for sinus problems, photophobia, shortness of breath, snoring, vomiting, joint tenderness, dizziness, and anxiety. (Tr. 1066). NP Thompson assessed Gill with immunosuppression due to drug therapy. (Tr. 1071). She recommended follow up in three months, as well as finding an adult rheumatology provider soon. (*Id.*).

On February 6, 2023, Gill met with Dr. Weyand, reporting ongoing concerns with completing her activities of daily living, including showering, changing clothes, and brushing her teeth. (Tr. 1113). Dr. Weyand noted that anxiety and depression may play a role in these activities, but in her opinion, ADHD was also a likely factor. (*Id.*). Dr. Weyand performed a structured adult ADHD assessment (Copeland); results confirmed criteria for ADHD with scores in the major difficulties range for both inattentive and hyperactive symptoms. (*Id.*). Dr. Weyand referred to Gill's primary care for medication management. (*Id.*).

Gill followed up with Dr. Pena on February 27, 2023 for follow up on her asthma. (Tr. 1151). She reported her cough was much better after starting her combination inhaler. (*Id.*). Her pulmonary function tests from August 2022 were improved. (*Id.*). Gill reported some new choking with liquids over the past few months. (*Id.*). Dr. Pena indicated that once Gill had addressed her breathing problems through nasal surgery, he would obtain a sleep study. (Tr. 1157). He also recommended taking albuterol prior to walking or taking stairs. (Tr. 1158). He recommended follow up in six months. (*Id.*).

On February 27, 2023, Gill had an ADHD evaluation and medication management with Kristin Lambert Jenkins, M.D. (Tr. 1159). Dr. Lambert Jenkins started Gill on 18 mg Concerta

and recommended good hygiene practices and setting alarms or physical reminders to help with self-hygiene. (*Id.*). Dr. Lambert Jenkins recommended follow up in one month. (*Id.*).

On March 1, 2023, Gill met with Nancy Delnay, APRN-CNP. (Tr. 1162). Gill reported she had a planned surgery with plastics and ENT for June 2023. (*Id.*). Gill reported walking up to three miles but was limited by her breathing problems; she also reported that the next day she was short of breath after climbing a flight of stairs. (*Id.*). Prior history included a July 1, 2021 CT of sinus with opacity and recommendation for polyp biopsy, a July 22, 2021 CT of her chest with ground glass appearance, an August 2021 ENT visit for chronic parsinusitis, and an August 23, 2021 emergency room visit for respiratory distress, including admittance to the hospital for hemoptysis, positive culture for pseudomonas, and a polyp biopsy positive for vasculitis. (Tr. 1163; *see also* Tr. 986-91). In her review of systems, Gill was positive for sinus problems but negative for cough and shortness of breath. (Tr. 1165). She was also negative for difficulty going up stairs, walking, joint range of motion, redness, swelling, and tenderness. (*Id.*). Examination revealed left nares with swollen turbinates unable to pass air, posterior pharynx red, tonsils +3. (Tr. 1166). She had full passive range of motion without pain, with hypermobility in elbows and knees. (*Id.*). CNP Delnay scheduled labs to coordinate with her ritux infusion the next month, and recommended scheduling surgery between ritux cycles. (Tr. 1169).

Gill met with Dr. Weyand on March 6, 2023, and reported she had started ADHD medication. (Tr. 1171). Gill reported feeling more clear headed but also more anxious; she was hopeful that her daily health and hygiene habits would improve with ADHD treatment. (*Id.*). Dr. Weyand continued Gill on Intuniv with recommendation to follow up in one month. (*Id.*).

Gill attended a surgical consult with Dane Genther, M.D. to discuss surgical options for her bilateral nasal obstruction. (Tr. 1492). Gill had recently switched rheumatology providers to

Dr. Villa Forte, who had recommended Rituxan infusions every five months rather than every six months. (*Id.*) Based on this schedule, Dr. Genther recommended scheduling surgery for the coming August. (*Id.*).

On May 11, 2023, Gill communicated with her rheumatologist, Alexandra Villa Forte, M.D., reporting a visible vein in her thigh that would ache periodically and cause discomfort. (Tr. 1473-74). She was concerned it was a symptom of vasculitis. (*Id.*). Dr. Villa Forte confirmed it was a varicose vein, painful with long periods of standing, and recommended compression stockings. (Tr. 1473). Dr. Villa Forte recommended follow up for mid-July. (Tr. 1471).

On July 6, 2023, Gill met with Dr. Weyand, who noted variable progress in her goals. (Tr. 1228). Gill was working at flea markets over the weekend, but reported she was not making much progress in her personal hygiene. (*Id.*). Gill's issues in maintaining personal hygiene appeared connected to her chronic health issues and self-esteem concerns. (*Id.*). Gill's grandmother attended the session with Dr. Weyand on August 2, 2023. (Tr. 1230). Her grandmother reported an increase in conflict due to Gill's difficulty in completing age-appropriate tasks in self-care and household responsibilities. (*Id.*). At this session, Gill was tearful and sad, and endorsed suicidal thoughts without plan or intent. (*Id.*).

On July 26, 2023, Gill met with Nichole Marino, PA, for pre-operative evaluation. (Tr. 1450-51). She presented with difficulty breathing through her nose for the past four years and intermittent nosebleeds. (Tr. 1451). Conservative measures had failed to improve her symptoms. (*Id.*). PA Marino cleared Gill as optimally prepared for surgery. (Tr. 1456).

On August 7, 2023, Dane Genther, M.D., performed surgical repair of Gill's nasal vestibular stenosis with excision of scar and stenting; nasal endoscopy with lysis of extensive

bilateral intranasal adhesions between septum and inferior turbinates; and bilateral inferior turbinate outfracture and lateralization. (Tr. 1401). Dr. Genther indicated Gill had near complete bilateral nasal stenosis secondary to scarring due to granulomatosis with polyangiitis, bilateral inferior turbinate hypertrophy and medialization. (Tr. 1402). Gill tolerated the procedure well and returned to recovery in good condition. (*Id.*).

Gill met with Dr. Pena on August 30, 2023 for follow up on her moderate asthma. (Tr. 1200). Dr. Pena noted no hospitalizations or ER visits since the last visit, and that Gill had a procedure to open her nasal passages and place stents. (*Id.*). Gill reported shortness of breath with climbing stairs and periodic issues with walking, although her cough had improved with her combination inhaler. (*Id.*). Gill reported difficulty breathing through her nose and nasal congestion, for which she took nasal steroids. (*Id.*). Her examination was otherwise normal. (Tr. 1204). Dr. Pena indicated Gill's shortness of breath with activity may be related to her granulomatosis. (Tr. 1205). He recommended updated pulmonary function testing and a sleep study once Gill had healed from the nasal stent surgery. (*Id.*). He recommended follow up in six months. (*Id.*).

On September 8, 2023, Gill attended a postsurgical follow up visit with Dr. Genther. (Tr. 1235). Gill was doing well; splints were removed and nasal cavities patent. (*Id.*). Dr. Genther recommended continued nasal irrigation and saline spray and cleared Gill for follow up with Dr. Woodard regarding sinus surgery. (*Id.*).

### C.    Medical Opinion Evidence

On October 14, 2022, state agency reviewing psychologist Karla Delcour, Ph.D., found that Gill had mild limitations in understanding, remembering, or applying information, interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing

herself. (Tr. 69). Dr. Delcour opined that Gill's mental impairments did not cause more than a mild impact on her function. (*Id.*).

On October 26, 2022, state agency reviewing physician Gerald Klyop, M.D., found that Gill did not meet or equal Listings 1.18 (abnormality of a major joint), 12.06 (anxiety and obsessive-compulsive disorders), and 14.07 (immune deficiency disorders, excluding HIV); she could perform work at the light exertional level. (Tr. 69-70). Dr. Klyop opined Gill could work at the light exertional level; she could occasionally lift, carry, push, and pull 20 pounds and 10 pounds frequently, but limited to standing/walking for no more than six hours and sitting for six hours out of an eight-hour workday. (Tr. 70). Dr. Klyop also opined Gill was limited to frequent balancing, occasional climbing of ramps/stairs, stooping, kneeling, crouching, and crawling, and never climbing ladders, ropes, or scaffolds, and no concentrated exposure to fumes, odors, dusts, gasses, and poor ventilation and all exposure to hazards. (Tr. 70-71).

On April 14, 2023, state agency reviewing physician Elizabeth Das, M.D., affirmed Dr. Dr. Klyop's findings, indicating his prior administrative findings were supported by and consistent with the evidence and the medical evidence of record at the reconsideration level did not support any changes to Dr. Klyop's residual functional capacity, save for additional narrative regarding Gill's granulomatosis, asthma, BMI, and scarred nares. (Tr. 80-81).

On April 27, 2023, state agency reviewing psychologist Kristen Haskins, Psy.D., found that Gill had more than mild limitations in her ability to function and were severe. (Tr. 78). Dr. Haskins rejected Dr. Delcour's initial findings as not supported or consistent with the record, particularly with respect to Gill's new ADHD diagnosis. (*Id.*). Dr. Haskins opined Gill could carry out a range of short cycle tasks in a setting without demands for fast paced or high production. (Tr. 82). She opined Gill could adjust to minor changes in the work setting and

complete an ordinary routine consistently on an independent basis, but that major changes would need to be introduced in advance and then gradually phased in to allow Plaintiff time to adjust to new expectations. (*Id*).

On June 28, 2023, NP Thompson completed a rheumatology medical source statement. (Tr. 1196-99). In it, NP Thompson described Gill's diagnoses as granulomatosis with polyangiitis, ANA positive, and Hashimoto's. (Tr. 1196). Gill's symptoms included immunosuppression, poor wound healing, shortness of breath, polyarthralgia, and intermittent joint pain in multiple joints. (*Id.*). Medication side effects leave Gill immunosuppressed. (*Id.*). NP Thompson opined that Gill could sit or stand for 45 minutes at a time, and could stand/walk 4 hours in an 8-hour day; she must walk every 20 minutes for 6-7 minutes at a time; she would need to take unscheduled breaks 1-2 times per day for 15 minutes each due to her pain and adverse effects of her medication. (Tr. 1197). Gill could occasionally lift and carry less than 10 pounds, rarely lift and carry 10-20 pounds, and never carry more than 20 pounds. (Tr. 1198). Gill would be off-task up to five percent of the workday and could perform low stress work. (*Id.*). Gill was likely to have good days and bad days, which would cause about three absences per month. (Tr. 1199).

On June 19, 2023, Chelsea Weyand, Psy.D., ABPP completed a mental health medical source statement. (Tr. 1194-95). Dr. Weyand noted Gill had been treating with her since May 2022 for her social anxiety disorder and ADHD. (Tr. 1194). Gill required repetition and support to remember her recommendations, but otherwise does well in therapy with consistent treatment. (*Id.*). Dr. Weyand opined Gill was unable to meet competitive standards in carrying out detailed instructions, working in proximity to others without distraction, complete a normal workday without interruptions from psychologically based symptoms, understanding and remembering

13

instructions, maintaining socially appropriate behavior and adhere to basic standards of neatness and cleanliness, and in setting realistic goals or making plans independently of others. (Tr. 1194-95). In Dr. Weyand's opinion, Gill would be absent from work one to two days per week and would be off-task about one quarter of the workday. (Tr. 1195). Dr. Weyand provided an updated statement on October 30, 2023. (Tr. 1511-12). In this statement, Dr. Weyand noted that Gill requires additional assistance to solve problems and engage in self-care tasks. (Tr. 1511). Dr. Weyand marked that Gill would be unable to meet competitive standards in nearly all areas. (Tr. 1511-12). She would be absent from work two to three times per week and would be off-task half of the workday. (Tr. 1512).

### D.    Function Reports

On March 23, 2023, Gill completed an adult function report. (Tr. 189-96). In it, Gill described her granulomatosis symptoms as painful joints in her legs, arms, hands, fingers, ankles, and hips, causing her pain and making it difficult to move. (Tr. 196). Her eyes will also flare up and become sensitive and painful. (*Id.*). The disease also affects her sinuses and lungs, causing difficulty breathing and restricting her sinuses; the disease also causes open cysts on her body. (*Id.*). She manages with Rituxan infusions every six months, although the above symptoms will reoccur one to two months before the next dose. (*Id.*).

### E.    Administrative Hearing Evidence

On December 6, 2023, Gill, represented by counsel, testified before the ALJ. (Tr. 35-63). Gill's counsel, after waiving a formal reading of the issues, provided an opening statement. (Tr. 39). He noted Gill worked at a flea market with her family but that the work was not substantial gainful activity. (Tr. 39-40). He recounted Gill's severe impairments as a rare autoimmune disorder – gastromatosis with polyangiitis – demonstrated by laboratory testing; co-morbidities

of asthma and hypothyroidism; and mental health impairments of social anxiety disorder and attention disorder. (Tr.40). With these issues, counsel noted Gill lived in a highly structured setting and needed assistance with her activities of daily living. (Tr. 40-41).

Gill testified that she lives with her grandmother and an aunt who is handicapped. (Tr. 42). She does not have a driver's license; her grandmother takes her to appointments. (*Id.*). She helps her family at flea markets by handling money some of the time, or to relieve her father so he can step away from the stall. (Tr. 42-43). Gill will often call her father when he steps away because she gets confused about the correct price for an item or what the correct change should be. (Tr. 52). She remains seated when at the flea market and cannot walk or lift anything. (Tr. 42). She helps out once or twice a month. (Tr. 43).

Gill complained of symptoms including sensitivity to bright lights and fast movement from her scleritis. (Tr. 45). She also has flares in her joints that result in an inability to walk, sit down, or lift her arms to brush her hair, shower, or change clothes. (*Id.*). She also has a buildup of scar tissue in her nose that causes her difficulty breathing. (*Id.*). She had surgery for this issue the previous August, but she believed that scar tissue had built up again because she continued to have difficulty breathing out of her nose. (*Id.*). She also has scarring and blood in her lungs from this disease. (*Id.*). Her difficulties breathing make it so she cannot walk for long distances without stopping to rest; climbing stairs can cause her to stop and catch her breath for ten minutes. (*Id.*).

Gill sees a rheumatologist for her breathing and joint pain and receives infusions of Rituxan every five months. (Tr. 46). Her joint flares come and go, but lifting a heavy object will usually trigger a flare. (*Id.*). Flares can last a day or up to an entire week. (Tr. 47). Gill testified that the flares continue despite the infusions. (*Id.*). Gill also testified that she was experiencing a

15

lung flare up as evidenced by lowered scores on her breathing tests. (Tr. 48). She previously had been able to walk up to three miles in a day a few months prior, but by the time of the hearing, she was only able to walk a few blocks, with rest. (Tr. 47-48). Gill stated she only brushes her teeth once or twice a month and only showers once per week because of fatigue while standing and lifting her arms to wash her hair. (Tr. 54). She only changes clothes when she showers. (*Id.*).

Gill has an ADHD diagnosis and experiences trouble concentrating; she needs basic instructions repeated to her because she has difficulty focusing. (Tr. 49). Gill had attempted medications but discontinued each due to side effects making her anxiety and depression worse. (Tr. 50). She takes Zoloft for depression and anxiety. (Tr. 51). Her self-care issues stem from depression and lack of motivation. (Tr. 57).

The VE then testified. The ALJ provided the following hypothetical: a younger individual with at least a high school education, no past work, limited to a range of light work involving no climbing of ladders, ropes, or scaffolds; no more than occasional climbing ramps or stairs, frequent balancing, occasional stooping, kneeling, crouching, and crawling; the individual must avoid concentrated exposure to pulmonary irritants such as fumes, odors, dust, gases, and poorly ventilated areas; must avoid all exposure to hazards such as unprotected heights and dangerous moving machinery; the individual can occasionally interact with coworkers and the public, can attend to and carry out simple, routine, repetitive tasks, but not at a production rate pace such as assembly line work; the individual can adapt to no more than infrequent changes in the work setting or duties that are explained or demonstrated in advance. (Tr. 59-60). The VE testified that the following jobs would be available: Office Cleaner, DOT 323.687.014, light, SVP 2, 200,000 jobs available in the national economy; Marker, DOT 209.587-034, light, SVP 2, 129,000 jobs in the national economy; and Assembler of Small Products/Bench Assembly,

DOT 706.684-022, light, SVP 2, 22,000 jobs in the national economy. (Tr. 60). The VE also testified that an individual could be off-task up to ten percent in a day. (*Id.*). If the person were off-task more than twenty percent in a day, no competitive work would be available. (Tr. 60-61). Similarly, an individual would not be able to sustain competitive work if the individual required redirection from a supervisor multiple times per day. (Tr. 61). An individual who would be absent four times per month would not sustain competitive employment. (Tr. 62).

## IV.    The ALJ's Decision

1.    The claimant has not engaged in substantial gainful activity since July 9, 2022, the application date (20 CFR 416.971 et seq.).

2.    The claimant has the following severe impairments: granulomatosis with polyangiitis/Wegener's granulomatosis; asthma; obesity; attention deficit disorder with hyperactivity (ADHD); and social anxiety disorder (20 CFR 416.920(c)).

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except that she can never climb ladders, ropes, or scaffolds; occasionally climb ramps or stairs, stoop, kneel, crouch, or crawl; frequently balance; must avoid concentrated exposure to pulmonary irritants; and must avoid all exposure to workplace hazards. She can tolerate occasional interactions with coworkers, or the public; she can attend to and carry out routine, repetitive tasks which do not require a production rate pace; and she can adapt to infrequent changes in her work setting or duties, if those changes are explained to her or demonstrated in advance.

5.    The claimant has no past relevant work (20 CFR 416.965).

6.    The claimant was born on February 12, 2004 and was 18 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.    The claimant has at least a high school education (20 CFR 416.964).

8.      Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10.     The claimant has not been under a disability, as defined in the Social Security Act, since July 9, 2022, the date the application was filed (20 CFR 416.920(g)).

(Tr. 19-26).

## V.      Law & Analysis

### A.      Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1.      whether the claimant is engaged in substantial gainful activity;

2.      if not, whether the claimant has a severe impairment or combination of impairments;

3.      if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4.      if not, whether the claimant can perform their past relevant work in light of his RFC; and

5.      if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

### B.      Standard of Review

This Court reviews the Commissioner's final decision to determine if it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not

uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 749 (6th Cir. 2007).

**VI.    Discussion**

Gill brings three issues for this Court's review:

1.    The ALJ's decision at Step Three of the Sequential Evaluation that Plaintiff's vasculitis and/or granulomatosis did not satisfy the criteria of Listing 14.03 was in error and not supported by substantial evidence.

2.    The ALJ erred when he failed to support and/or address consistency with his conclusions regarding the opinions of the treating sources.

3.    The ALJ erroneously failed to comply with Social Security Ruling 16-3p when evaluating the totality of Plaintiff's symptoms.

(ECF Doc. 7, p. 1). For the reasons that follow, I find that the ALJ erred with respect to Issue One and recommend the District Court remand for further evaluation of Gill's granulomatosis with respect to the applicable Listings. My review of Issues Two and Three do not reveal the errors Gill argues; nonetheless, because my recommendation on the first issue is dispositive, the case must be remanded in its entirety.

**A.    The ALJ failed to articulate his consideration of any Listing appropriate to Gill's severe impairment of granulomatosis with polyangiitis.**

Gill rightly argues that "the ALJ failed to discuss whether he considered any Listings related to [her] severe impairment of granulomatosis, which is a type of vasculitis." (*Id.* at p. 9). She further explains that vasculitis is an inflammation of blood vessels and is established through

20

tissue biopsy; she had a skin biopsy in 2021 positive for vasculitis. (*Id.* at p. 10, citing Tr. 390, 573). She points to Listing 14.00D2 (systemic vasculitis) as confirmation that her severe impairment of granulomatosis was contained within a specific listed impairment. (*Id.* at p. 9). Gill further argues that she meets the criteria for Listing 14.03 and should be considered disabled at Step Three of the sequential evaluation. (*Id.* at pp. 10-14).

The Commissioner argues that there is no reversible error in the ALJ's failing to consider Gill's granulomatosis with polyangiitis because Gill did not raise a specific Listings argument during her hearing and thereby forfeited this claim. (ECF Doc. 9, pp. 9-10). In support, the Commissioner points to the state agency reviewing physicians' opinions to show that substantial evidence supported the ALJ's determination that Gill did not meet or medically equal a Listing. (*Id.* at p. 10).

The Commissioner's argument misses the mark. Although substantial evidence may ultimately support a determination that Gill does not meet or medically equal a listed impairment, that does not absolve the ALJ of his silence on the matter. This Court's consideration on review is twofold: one, whether the ALJ articulated his reasoning and supported his conclusions with substantial evidence; and two, whether the ALJ made his determination according to proper legal standards. *See Napier v. Comm'r of Soc. Sec.* 127 F.4th 1000, 1004 (6th Cir. 2025). No matter the substantial evidence available, a failure to follow regulations may yet result in reversible error. *See Rabbers*, 582 F.3d at 651.

Here, the ALJ has failed as to both considerations. The ALJ did not discuss any listing pertinent to Gill's granulomatosis with polyangiitis and thereby failed to support any conclusion with substantial evidence; and, by failing to discuss any relevant listing, failed to follow Agency regulations.

I first address the Commissioner's waiver argument. It is true that the ALJ is not required to discuss a specific listing, particularly where the claimant does not raise that listing during the hearing. *Wilson v. Comm'r of Soc. Sec.*, 618 F. App'x 281, 286 (6th Cir. 2015), citing *Malone v. Comm'r of Soc. Sec.*, 507 F. App'x 470, 472 (6th Cir. 2012). However, I do not read *Wilson* to state that a failure to raise a specific listing at the hearing results in a plaintiff waiving the right to raise a relevant listing issue at a later date. Rather, the Sixth Circuit rejected Wilson's argument that the ALJ must discuss a specific listing where her counsel did not raise it at the hearing and where she offered no evidence that the specific listing applied to her. *Id.* Moreover, a disability hearing is not a court proceeding and "many of the rules governing such hearings are less rigid than those a court would follow." *Biestek*, 587 U.S. at 99. Likewise, the "ALJ is to conduct a disability hearing in 'an informal, non-adversarial manner." *Id.*, quoting 20 C.F.R. § 404.900(b).

During Gill's hearing, her attorney does not raise a specific listing. (*See* Tr. 39-41). However, he stated on the record that Gill had "a rare autoimmune disorder called gastromatosis [*sic*] with polyangiitis. . . . demonstrated by the laboratory testing. She has co-sustained comorbidities such as asthma and hypothyroidism, and . . . a social anxiety disorder and attention disorder." (Tr. 40). This recitation of Gill's severe impairments, particularly in the context of a non-adversarial hearing, appear to sufficiently alert the ALJ that granulomatosis with polyangiitis should be considered under the listings, and that this condition is distinct from Gill's other conditions, such as asthma, which the ALJ did consider under the listings. Thus, I determine waiver is inapplicable.

That said, I turn to the merits of whether the ALJ should have considered Gill's granulomatosis with polyangiitis under Listing 14.03. At Step Three, the ALJ must "evaluate the evidence, compare it to [the relevant listed impairment], and give an explained conclusion, in

order to facilitate meaningful judicial review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011). However, the ALJ need not discuss a listing that the claimant clearly does not meet. *Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x 639, 641 (6th Cir. 2013). Nor does the ALJ commit reversible error if the claimant does not raise a "substantial question" as to whether a listing was met – i.e., point to specific evidence that demonstrates a reasonable possibility that an impairment or combination of impairments met or medically equaled the criteria of a listing. *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432-33 (6th Cir. 2014)

Here, the ALJ determined that Gill did not meet the severity requirements for any listed impairment. (Tr. 20). The only physical impairment the ALJ considered under the listings was asthma under Listing 3.03: "The claimant's asthma symptoms were considered as they relate to Listing 3.03; however, her asthma is mild and has not required any hospital admissions during the relevant period. The record does not support that asthma is an impairment which meets the requirements of Listing 3.03." (*Id.*). The ALJ makes no mention of any of Gill's other physical impairments. (*See id.*). Although the ALJ is not required to comprehensively consider each specific listing when making a Step Three determination, it is concerning that the ALJ makes no mention of granulomatosis with polyangiitis, which appears to be Gill's primary severe impairment. I will not recite again what is apparent in the medical record – Gill has clearly presented sufficient evidence to raise a "substantial question" that her granulomatosis with polyangiitis may meet the criteria of Listing 14.03. Generally, the Social Security Administration defines systemic vasculitis in relevant part, as follows:

**Systemic vasculitis (14.03)**

(i) Vasculitis is an inflammation of blood vessels. . . . Systemic vasculitis may also be associated with other autoimmune disorders;

(ii) There are several clinical patterns, including but not limited to . . . Wegener's granulomatosis.

*Documentation of systemic vasculitis.* Angiography or tissue biopsy confirms a diagnosis of systemic vasculitis when the disease is suspected clinically.

Listing 14.00D2. More specifically, the Social Security Administration defines the listing criteria as follows:

**14.03 Systemic vasculitis.** As described in 14.00D2. With:

A.      Involvement of two or more organs/body systems, with:

1.      One of the organs/body systems involved to at least a moderate level of severity; and

2.      At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss).

OR

B.      Repeated manifestations of systemic vasculitis, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:

1.      Limitation of activities of daily living.

2.      Limitation in maintaining social functioning.

3.      Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

Listing 14.03. I note here that the alternate name for Gill's condition – Wegener's granulomatosis – is specifically named in Listing 14.00D2. This alone leads to the conclusion that the ALJ should have considered Gill's condition under these listings. Gill has confirmed this diagnosis with a positive biopsy, as that section requires. (Tr. 986-91, 1163). She regularly treats this condition with multiple specialists, including rheumatology, pulmonology, ENT, and reconstructive surgeons. Even with regular and intensive treatment, Gill still presents evidence of

significant symptoms affecting her daily living as a result of this condition. She clearly has raised a substantial question that she may meet the criteria of Listing 14.03.

However, I cannot reach Gill's assertion that she should have been found disabled at Step Three because the ALJ has provided no analysis of this listing. The regulations require that the ALJ consider the medical severity of a claimant's impairments against the relevant listing, and articulate that consideration for subsequent review. 20 C.F.R. § 404.1520(a)(4)(iii); *Reynolds*, 424 F. App'x at 416. The Commissioner's decision will not be upheld where the failure to follow the regulations prejudices a claimant on the merits. *Bowen*, 478 F.3d at 746.

Because the ALJ did not follow the Administration's regulations and articulate any consideration of Listing 14.03, I must recommend remand for consideration of this Listing.

Although this issue is dispositive, I respond to Gill's next issues for completeness.

### B.  The ALJ did not fail to comply with Social Security Ruling 16-3p.

Gill also argues that the ALJ did not consider the totality of her symptoms under Social Security Ruling 16-3p. (ECF Doc. 7, pp. 20-25). She points to evidence throughout the record that she claims demonstrates that she is more impaired than articulated by the ALJ, such as shortness of breath, difficulty in maintaining her hygiene, blurry vision, skin lesions, asthma, and joint pain. (*Id.*). At bottom, Gill argues that the ALJ provided an "insufficient analysis" of her symptoms and that, on balance, her symptoms are more disabling than accounted for in the ALJ's articulated reasoning. (*Id.* at p. 24). The Commissioner, however, argues that the ALJ supported his conclusions with substantial evidence, and that Gill is improperly asking the Court to reweigh the case *de novo*. (ECF Doc. 9, pp. 16-17).

Under SSR 16-3p, the ALJ evaluates a claimant's impairment-related symptoms under a two-step process. SSR 16-3p. When assessing a claimant's subjective statements, first, "the ALJ

must determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged." *Calvin v. Comm'r of Soc. Sec.*, 437 F. App'x 370, 371 (6th Cir. 2011); *see also* SSR 16-3p, 2017 WL 5180304, *3 (Oct. 25, 2017). The ALJ must determine whether there is objective medical evidence from an acceptable medical source showing that the claimant has a medical impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p, 2017 WL 5180304, *3. If there is, the ALJ moves to the second step under SSR 16-3p and considers all the evidence to determine the extent to which the symptom affects the claimant's ability to work. *Heart v. Comm'r of Soc. Sec.,* No. 22-3282, 2022 WL 19334605, *3 (6th Cir. Dec. 8, 2022).

At the second step, the ALJ will "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." SSR 16-3p, 2017 WL 5180304, *3. In so doing, the ALJ must consider the objective medical evidence as well as the claimant's reported daily activities, including several other factors, to evaluate the intensity, persistence, and functional limitations of the claimant's symptoms. *See Curler v. Comm'r of Soc. Sec.*, 561 F. App'x 464, 474 (6th Cir. 2014); SSR 16-3p, 2017 WL 5180304, *4, *7-8. Such factors can include medication, its effectiveness, and any side effects; treatment other than medication; accommodations a claimant makes to alleviate symptoms; or other daily activities. SSR 16-3p, 2017 WL 5180304, *7-8. To make this determination, the ALJ considers medical and non-medical sources, as well as the claimant's personal statements about their symptoms. *See generally id.*

However, this Court's review of an ALJ's consideration of a claimant's subjective symptoms must be deferential. A reviewing court "must affirm the ALJ's decision as long as it is

26

supported by substantial evidence and is in accordance with applicable law." *Showalter v. Kijakazi,* No. 22-5718, 2023 WL 2523304, *2 (6th Cir., Mar. 15, 2023).

In this issue, Gill presents a number of examples to demonstrate that her symptoms will wax and wane in duration and intensity. (ECF Doc. 7, pp, 20-24). She states that although the ALJ points to certain portions of the record where she is able to walk for long distances or play video games, this does not provide the support of substantial evidence. (*Id.* at p. 23). Rather, Gill presents her symptom statements in the record demonstrating that she will pay the price of this activity in the days that follow any activity. (*Id.* at pp. 20-23). For example, if she climbed stairs, she would need to stop and catch her breath; if she took a walk one day, her leg might flare up and she would be short of breath the next day. (*Id.*, citing Tr. 47-48, 52-53, 1162). Gill also points out issues with her medication management, and that she would have increased joint pain as her six-month infusion wore off. (*Id.* at p. 20). She also notes that the ALJ's statements at certain points consider only a portion of her symptoms but do not look to the whole picture – e.g., the ALJ considered shortness of breath in the context only of her asthma or obesity as related to her joint pain, rather than considering the entirety of her symptomology. (*Id.* at p. 23).

I also note that many of the issues that Gill raises in this section are related to her granulomatosis with polyangiitis condition. This is a wide-ranging autoimmune condition that causes Gill shortness of breath and difficulty breathing, joint pain, fatigue, skin lesions, and affects multiple organ systems. She also has co-occurring conditions such as asthma, obesity, and ADHD, which have overlapping symptoms to her granulomatosis with polyangiitis. To the extent that the ALJ must re-consider these symptoms as a result of the Listing 14.03 analysis, the ALJ should consider all of Gill's conditions in combination.

Nonetheless, I must provide the ALJ's consideration of the symptom statements in this decision with deference on review. And my review of the ALJ's decision reveals that the ALJ considered the evidence and articulated his reasoning consistent with SSR 16-3p's two-part process. (*See* Tr. 22-23). The ALJ names all of Gill's severe impairments, and discusses his review of her and her grandmother's function reports, the effects of her medication, and her daily activities. (*Id.*). After consideration of this evidence, the ALJ has an available zone of choice within which to make his determination, and chose to find her symptom statements not entirely consistent with his review of the evidence. (*Id.*). With this proper articulation, I must defer. I therefore recommend the District Court affirm as to this issue.

### C. The ALJ did not err in his consideration of treating source opinions.

Gill next states that the ALJ erred with respect to his consideration of the opinions from NP Thompson and Dr. Weyand. (ECF Doc. 7, pp. 14-19). Gill notes in passing that the regulations find supportability and consistency are "important" in determining the persuasiveness of medical opinions. (*Id.* at p. 15). However, this statement is not entirely accurate with respect to the regulations, and as a result, Gill's argument on this issue fails. As the Commissioner points out, the ALJ did articulate his consideration of NP Thompson and Dr. Weyand's opinions in the required terms of "supportability" and "consistency." (ECF Doc. 9, pp. 10-15). The Commissioner need not articulate consideration of all factors, and the failure to do so is not reversible error. (*Id.*at p. 15). Moreover, Gill's argument regarding the body of evidence that she believes cuts against the ALJ's medical opinion determination is merely a request to reweigh the evidence.

The evaluation of medical opinion evidence is governed by 20 C.F.R. § 404.1520c. This regulation mandates that the ALJ "will not defer or give any evidentiary weight, including

controlling weight to any medical opinion(s) . . . ." 20 C.F.R. § 404.1520c(a). Rather, the ALJ

must evaluate each medical opinion's persuasiveness based on its: (1) supportability; (2)

consistency; (3) relationship with the plaintiff; (4) specialization; and, (5) "other factors that tend

to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R.

§ 404.1520c(c); *see also Heather B. v. Comm'r of Soc. Sec.,* No. 3:20-cv-442,2022 WL 3445856

(S.D. Ohio Aug. 17, 2022). Supportability and consistency are the most important factors; ALJs

must "explain how [they] considered the supportability and consistency factors for a medical

source's medical opinions or prior administrative findings in [their] determination or decision."

20 C.F.R. § 404.1520c(b)(2). ALJs "may, but are not required to," consider factors three through

five when evaluating medical source opinions. (*Id.*).

For supportability, "[t]he more relevant the objective medical evidence and supporting

explanations presented by a medical source are to support his or her medical opinion(s) . . . the

more persuasive the medical opinions . . . will be." 20 C.F.R. § 404.1520c(c)(1). For consistency,

"[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources

and non-medical sources in the claim, the more persuasive the medical opinion(s) . . . . 20 C.F.R.

§ 404.1520c(c)(2).

An ALJ must "provide a coherent explanation of his [or her] reasoning. *Lester v. Saul*,

No. 5:20-cv-01364, 20 WL 8093313 at *14 (N.D. Ohio Dec. 11, 2020), *report and

recommendation adopted sub nom., Lester v. Comm'r of Soc. Sec.,* No. 5:20-cv-01364. 2021 WL

119287 (N.D Ohio, Jan. 13, 2021). The ALJ's medical source opinion evaluation must contain a

"minimum level of articulation" to "provide sufficient rationale for a reviewing adjudicator or

court." *Revisions to Rules Regarding the Evaluation of Medical Evidence,* 2017 WL 168819, 82

Fed. Reg. 5844, 5858 (Jan. 18, 2017). If an ALJ does not "meet these minimum levels of

articulation," it "frustrates this [C]ourt's ability to determine whether her disability determination was supported by substantial evidence." *Heather B.,* at *3, *citing Warren I. v. Comm'r of Soc. Sec.,* No. 5:20-cv-495, 2021 WL 860506, at *8 (N.D.N.Y., Mar. 8, 2021).

Here, the ALJ considered the medical opinions as follows:

Dr. Chelsea Weyand, PsyD submitted two opinions related to the claimant's mental health limitations, the first in June 2023, and the second in October 2023. (Ex. 8F; 15F) While these opinions were dated four months apart, the second opinion describes substantially greater limitations, and additional marked limitations, without any corresponding change in the claimant's observed or reported symptoms. . . . The lack of consistency between these opinions, and reported increase in the degree of her limitations with no corresponding or supporting counseling notes which reflect any change in her condition renders both opinions minimally persuasive. Considering the elements of Dr. Weyand's opinions which are consistent, and which are corroborated by other records, there is sufficient evidence to find that the claimant can tolerate no more than occasional interactions with coworkers, or with the public. She retains the ability to concentrate on TV and video games, and can thus attend to and carry out routine, repetitive tasks which do not have 'production rate' pace requirements. Lastly, while the claimant is sensitive to stress, she remains capable of adapting to infrequent changes in her work setting or work duties, so long as such changes are explained to her or demonstrated for her in advance.

. . .

Nurse practitioner Marlene Thompson, APRN-CNP opined that the claimant can sit or stand for about 45 minutes at a time, for a total of 4 hours per day sitting, or standing/walking; she must be allowed to walk every 15-20 minutes for 5-8 minutes; she requires 1-2 unscheduled breaks per day, lasting 15 minutes; she can rarely lift 10 pounds and occasionally lift less than 10 pounds; she is capable of low-stress work, but will be off-task 5% of the time, and absent about 3 days per month. (Ex. 9F) This opinion is overall not persuasive, as it is not supported by the objective records. The claimant reports walking up to 3 miles at some times. At a typical walking pace, that would take her significantly longer than 45 minutes of walking or standing. Similarly, there is no objective medical evidence or symptoms which are cited to support that the claimant will be absent from work multiple days per month on a regular and ongoing basis. The claimant receives infusion treatments twice a year, which can reasonably expected to cause her to miss work. While she alleged that her symptoms 'flare' approximately 4 months after her infusion, and cause her to experienced increased symptoms during the 2 months which remain until her next infusion, such complaints are not reflected in the record.

(Tr. 23-24). As is clear in the excerpts above, the ALJ discusses these opinions in terms of supportability and consistency, as is required. The ALJ further supported his consideration of both of these opinions with reference to the rest of the record, and in reference to the other medical opinions available. (*See* Tr. 21-24).

Although Gill provides numerous reasons why the ALJ should have found her treating source opinions persuasive, she has not shown that he failed to follow the regulations' requirements, or that substantial evidence did not support his reasoning. I therefore find no reversible error as to this issue.

## V.    Recommendation

Because the ALJ failed to apply proper legal standards in the Listings determination, I recommend that the Commissioner's final decision denying Gill's application for SSI be vacated and that her case be remanded for further consideration of this issue.

Dated: September 11, 2025

Reuben J. Sheperd
United States Magistrate Judge

———————————————————

## OBJECTIONS

### <u>Objections, Review, and Appeal</u>

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

\* \* \*

31

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) quoting *Howard*. The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).